Filed 4/24/13  In re E.D. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.D. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>N.D.,<br><br>Defendant and Appellant. | F064623<br><br>(Super. Ct. Nos. JD127180, JD127181, JD127182, & JD127183)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Louie L. Vega, Judge.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant.

Theresa A. Goldner, County Counsel, Jennifer E. Feige, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Wiseman, Acting P.J., Levy, J., and Peña, J.

Appellant N.D. is the father of E.D., N.D., Jr., D.D. and N.D., all of whom were removed from his home by respondent Kern County Department of Human Services in August 2011. He appeals from the juvenile court's orders finding dependency jurisdiction over the children and continuing the children's removal from his home during the provision of reunification services. This appeal is related to the mother's appeal, *In re N.D.* (Dec. 19, 2012, F064583) (nonpub. opn.), in which we affirmed the juvenile court's dispositional order regarding the youngest child, N.D. We will affirm here as well.

## *FACTUAL AND PROCEDURAL HISTORIES*

The account that follows is taken mostly from our opinion in *In re N.D., supra*, F064583, which involved the same facts and proceedings as this appeal. The scope of the mother's appeal was limited to the dispositional order regarding the youngest child, N.D., but we discussed the record concerning all the children and all stages of the proceedings.

N.D. is eight years old. His mother is R.D. (mother). His father, N.D. (father), has three other children by J.H.: E.D., who is 18, N.D., Jr. (Junior), 16, and D.D., 13. N.D. is mother's only child. Father and mother have been married since 2003. J.H. has been convicted of second degree murder and is serving a term in state prison.

On August 18, 2011, E.D. called the police from the home of a friend. She told the police she had had a fight with her stepmother (mother) and had been kicked out of the house.

Miriam Orozco, a county social worker, went to the friend's house the same day and interviewed E.D. She had a scratch and some redness on her face. She told Orozco that the previous Saturday, August 13, she had been watching television when mother took the remote control away from her and changed the channel. E.D. and mother argued over this, and mother slapped E.D. on her face a number of times, pulled her hair, threw water on her, and hit her neck with a towel. Mother also tried to move a chair while E.D.

2.

was sitting in it. E.D. said she threw up in the bathroom after the incident. She did not tell father about the incident and falsely told him N.D. had made the scratch on her cheek. She said she feared father would blame her if he found out. On August 17, 2011, N.D. told father about the incident, and father became angry at E.D., telling her to pack up and leave if she wanted to. She did, and heard father lock the door behind her. E.D. then walked to the friend's house.

E.D. also told Orozco that father and mother smoked marijuana daily, often in front of her. E.D. said father had at least five marijuana plants growing in the back yard. That July, father made brownies with marijuana in them and gave her and N.D. each one to eat. Once, before N.D. was born, father gave E.D. a sandwich made with peanut butter and marijuana.

Orozco and police officers next went to the family's house. Orozco smelled a strong odor of marijuana emanating from the house even before going inside. Father admitted he had five marijuana plants in the back yard and showed them to the social worker. They were large, visible, and accessible to the children; when they were counted, there turned out to be six, not five. Father said he had been smoking marijuana for 25 years and that he had grown up with it, as his parents welcomed it in their home. He said he and mother usually smoked it in their bedroom or the garage, but he conceded that his children had seen them smoke it. Father and mother smoked marijuana in their bedroom every night. Friends of father's came to the house to smoke with him, and the children had seen this also.

Father admitted he made marijuana brownies on the occasion to which E.D. had referred. He denied, however, that he had given them to E.D. and N.D. He made a batch of regular brownies as well, and gave those to the children. He said he told E.D. she was getting one of the marijuana brownies because she had asked for one. He believed E.D. had once eaten a marijuana brownie at his parents' house. Father confirmed that he had

3.

allowed E.D., at her request, to harvest leaves from his marijuana plants during the last few days. E.D. liked the way marijuana smelled and looked, he said.

An officer spoke with Junior. He said his father once gave him a marijuana brownie to eat. Father denied this. Junior said he had seen his father smoke marijuana.

After initially denying it, father admitted there was marijuana in the house. He allowed the officers to look around, and they found a quarter ounce on his bed. Father also confirmed that a social worker had been to the house on a prior occasion and had told him that being high in the presence of the children and exposing them to marijuana was unacceptable.

The children were removed and placed in protective custody the same day, August 18, 2011. The following day, another county social worker, Kathleen Neuman, interviewed mother, D.D., Junior, and E.D. Mother said E.D. hates her, has an anger problem, and in 2009 physically assaulted her. Mother admitted she smoked marijuana, but denied she did so in front of the children.

D.D. told Neuman that his father made marijuana brownies in July and offered him one. D.D. helped water the marijuana plants. He said his parents both smoke marijuana three times a day, and he had been aware that they did so for the last four years, since he was eight.

Junior told Neuman that father and mother smoke marijuana all day every day, and that he saw them smoke at least 15 times each month. He said they smoke in the car on the way to work, and his father smokes all day during his work as a gardener. Sometimes father and mother smoked in the car while the children were in the car. When told of mother's claim that she never smoked in front of the children, Junior said, "she's crazy."

E.D. said father and mother go to their bedroom every night after dinner to smoke marijuana. They remain there for the rest of the evening, leaving E.D. to care for the other children. She again stated that she and N.D. ate marijuana brownies made by her

father in July. She said she did not know the brownies had marijuana before she ate one. The marijuana made her "feel like she was on a roller coaster," and she did not like it. Her father laughed and said she was "not a 'drugee.'" E.D. said she cut the leaves from a marijuana plant at her father's request.

The children complained to Neuman about mother. Junior confirmed E.D.'s statements that mother started the fight with E.D., that E.D. was trying to avoid a confrontation with mother, and that mother slapped and poured water on E.D. and dumped E.D. out of a chair. D.D., Junior, and E.D. each felt that mother was excessively focused on making them keep the house clean. E.D. said mother comes in her bedroom and dumps out the contents of her drawers if she disapproves of the way they are arranged, and sometimes removes clothing from her room and throws it away because she does not like it. E.D. admitted she hit mother in 2009.

Neuman spoke with M.K., father's mother. M.K. said "her son puts [mother] in front of everyone including his own children." When the family was living in Las Vegas, M.K. paid for them to move back to Bakersfield because she was concerned about the children. The family lived with M.K. when they returned, but she moved out because "things with [mother] were so bad ...."

Neuman spoke with father a few days later, on August 22, 2011. Father claimed it was E.D. who was abusing mother and said E.D. lies, cheats, and steals. Father also said the marijuana plants had been removed from the yard.

The Kern County Department of Human Services filed dependency petitions in juvenile court for all the children on August 22, 2011. The petitions alleged, based on the marijuana-related facts, that father failed to protect the children. Based on the incident between E.D. and mother, the petition for the youngest child, N.D., alleged that

5.

there was a risk of serious physical harm to the child and that father failed to protect the child from mother. (Welf. & Inst. Code, § 300, subds. (a), (b).)[1]

In her report prepared for the detention hearing, Neuman described the family's history of referrals to child welfare agencies in Kern County and in Clark County, Nevada. There were seven prior referrals, three of which were substantiated. A referral received by Kern County on October 31, 2002, was substantiated against mother for physical abuse of Junior, who was then six years old.[2] Junior had a red bruise on the inside of one arm, extending from wrist to elbow. He had a circular purple bruise on his spine and two bruises extending from the spine toward the hip. At first, Junior said he had gotten "a 'whoopin,'" but then offered several alternative explanations involving accidents, none of which were consistent with the injuries. Junior and mother then claimed that father had inflicted the injuries. Father admitted that he sometimes hit his children with a belt, but said he never left marks; after initially saying mother was not responsible, he later blamed her. The department concluded that mother had made "increasingly dishonest statements throughout the investigation" and found she had inflicted the injuries.

The second substantiated report was received by Kern County on September 28, 2009. E.D., Junior, and D.D. separately reported "being made to feel unloved and unwanted" by mother. E.D. reported ideas of hurting herself and said mother called her a bitch. Junior and D.D. reported dreams involving mother taking the children away and robbing the house. The department found that mother had engaged in emotional abuse.

_____

[1]Subsequent statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]The party in question is identified in Neuman's report as R.S. and referred to as father's girlfriend. It is clear from other references in the record that this is mother. Mother is elsewhere referred to as R.S.-D., and police records show that R.S. is also known as R.D. She testified that she met father in 2000, moved in with him within a year, and has lived with him ever since.

6.

A referral alleging physical abuse by mother was made at the same time, but the department did not find evidence to support it.

Kern County received the third substantiated report on May 18, 2011. Social workers went to the family's home to investigate after N.D. brought a live bullet to school, saying it came from his house. The social workers found that the home smelled strongly of marijuana. The children were present. Father showed the social workers a medical marijuana card.[3] He said he had been smoking in his room, but the social workers believed, based on the smell, that marijuana had been smoked throughout the house. The social workers interviewed N.D., who now said he found the bullet on the school bus. Father did not allow the social workers to interview any of the other children. The department found general neglect by father based on exposing the children to marijuana smoke. It found failure to protect on the part of mother.

The unsubstantiated referrals included three received by authorities in Clark County, Nevada, each alleging physical abuse of E.D. The county received the referrals on March 24, 2004, May 1, 2005, and May 26, 2005, when E.D. was 9 and 10 years old. In each instance, bruises were seen on E.D.'s back, legs, hips, buttocks, or sides. In the first case, father admitted he hit her with a belt and said it was because he heard her talking about oral sex. Father was "advised not to leave marks or bruises" and the referral was found unsubstantiated. In the second case, father and mother said they spanked E.D. because she was "out of control and would not do her chores." The referral

_____

[3]The California Department of Public Health issues medical marijuana identification cards to patients who have obtained recommendations from their physicians for use of medical marijuana. Law enforcement personnel and others can verify the validity of identification cards by using a verification database available on the Internet. (Cal. Dept. of Public Health official web site, <http://www.cdph.ca.gov/programs/mmp/Pages/default.aspx> as of Apr. 23, 2013.) At the detention hearing, counsel for the children represented to the court that, according to experts whose testimony she had heard, a doctor's recommendation to use marijuana does not specify a dosage, but simply recommends that marijuana be used as needed.

was found unsubstantiated and "the family was referred to counseling." In the third case, E.D. had "a black bruise on her back approximately the size of a grapefruit," which was seen by a teacher, and father admitted he hit her with a belt. Father was warned that he could face criminal charges if he continued to inflict excessive punishment. Again, however, the referral was found unsubstantiated because "the family 'was working on the matters at hand.'"

Kern County received a marijuana-related referral on August 16, 2010, that was found unsubstantiated. The department found that the house did not smell of marijuana, and that there was no evidence the parents smoked daily in the presence of the children or used Junior to deliver marijuana to others. Father said he had a medical marijuana card and smoked marijuana for pain management. The department concluded that if the parents were using marijuana, their use did not affect their care of the children. Father was "minimally cooperative" during the investigation, and the department felt that "concerns remain for this family due to their Child Protective Services history and the father's criminal history." Father's criminal history is discussed below.

There are indications in Neuman's report for the detention hearing that, over the course of the family's many years of contacts with child welfare authorities, the children had been taught to lie to protect father and mother. In connection with the referral in the present case, E.D. told Neuman "she never said anything to CPS because her parents prepared the children with what to say to avoid further involvement or investigation." As already mentioned, in 2002 Junior gave various inconsistent explanations of his bruises in an attempt to make social workers believe they resulted from an accident. E.D. told Neuman she "is afraid to go home because she is now telling the truth and is afraid what her parents will do."

Neuman's detention report included father's criminal history. He was charged with 16 offenses between 1995 and 2002, some with prior prison term enhancements. In 2002, father pleaded no contest to possession of more than an ounce of marijuana. In

1998, he pleaded guilty to driving with a suspended or revoked license, not wearing a safety belt while driving, driving without auto insurance, driving an unregistered vehicle, and failure to appear. In 1995, he pleaded no contest to possession of a controlled substance.

The detention hearing took place on August 23, 2011. The parents denied the allegations in the petitions. The court found that a prima facie showing had been made, based on the allegations in the petitions and the facts set forth in Neuman's report, that the children came within section 300. It found that their continuance in the parents' home would be contrary to their welfare and that reasonable efforts had been made to avoid the need for removal. The children were ordered detained. Visitation was ordered. The parents were ordered to submit to drug testing. Mother's counsel said mother would submit to testing voluntarily.

Neuman prepared a report for the jurisdiction hearing. It stated that on August 23, 2011, after the detention hearing, Neuman again spoke to the children. E.D. and Junior said they did not want to visit with their father. They also said they heard their father refuse to submit voluntarily to drug testing.

E.D. told Neuman that from the ages of 10 to 13, when the family lived in Las Vegas, she was kept home from school to care for N.D. She had difficulty with math, reading, and writing when she entered eighth grade after the family returned to Bakersfield.

Junior said that, seven years ago, the children were given sandwiches made with peanut butter and marijuana. E.D., Junior, and D.D. said their father procured marijuana from a dispensary; the children pointed the dispensary out as they and Neuman passed it on the way to the foster care center where the children were staying. E.D. and Junior had been inside. D.D. said he always waited outside. E.D., Junior, and D.D. all said they had delivered marijuana to other people for their father, packaged in small green containers or zip lock bags. The three older children said their father also had used N.D. to make

9.

deliveries.  For N.D., the marijuana packages were concealed inside green peppers "so if anyone looked inside the bag it looked like he was just carrying vegetables."

Neuman's jurisdiction report included an excerpt from a police report made on August 18, 2011, by the police officers who went to the house on the day E.D. contacted the authorities.  The report stated that M.K. (father's mother) said mother had been hitting and abusing E.D. for years, and that father knew about it and did not prevent it.  M.K. said father verbally abused E.D. as well.  The report included the officers' description of mother's account of the altercation with E.D.  Mother felt that E.D. constantly disrespected her and undermined her authority.  She confirmed most of the facts E.D. described:  She took the remote control away from E.D., slapped E.D., pulled E.D.'s hair, threw water on E.D., and hit E.D. with a dish towel.  In mother's version, however, E.D. grabbed mother's arm before mother touched E.D., and E.D. had a bad attitude.

Neuman noted that father had a medical marijuana card, but contrasted the alleged medical need with the actual role of marijuana in the home:  The parents smoked marijuana in front of the children and exposed them to second-hand marijuana smoke daily; father fed the children food made with marijuana and used the children to help him cultivate and distribute marijuana; mother smoked marijuana in the car with the children; and mother and father left E.D. to care for the other children while mother and father smoked marijuana in their bedroom.  Mother had not, up to that point, claimed a medical reason for marijuana use.

Mother testified at the jurisdiction hearing on October 4, 2011.  She testified that E.D. was very disrespectful and disobedient, gave her dirty looks, and had bad posture.  Mother described the fight between her and E.D. on August 13, 2011, in essentially the same way she had described it to the police.  She added that when she threw water on E.D., E.D. was charging at her and pushing her against a window and had to be restrained by the boys.  Mother described another incident, in February 2010, when she argued with

10.

E.D. Mother was holding onto E.D.'s hands when E.D. got one hand free and hit mother with it.

Mother said she began smoking marijuana in 2000, when she met father. She smoked recreationally with father and his parents. Later, she began having muscle spasms in her leg. In 2009, a doctor prescribed "some medicine that started with an A," but it made her feel nauseated. Marijuana, however, made her leg feel better. She decided not to take a second medication her doctor recommended because of side effects about which she had read. When asked whether she smoked every day, she began by saying no, but then continued, "Most—sometime during the week, Monday through Fridays, maybe twice at night, and on the weekend at night, Friday, Saturday, and Sunday." In August 2011, after the children were removed from the house, she obtained a medical recommendation to use marijuana.

Mother admitted she smoked marijuana in front of the children when they were with father's parents. "When they would visit or when we were there, it was a social thing where it was around the table in front of the kids." She denied smoking in front of the children in her home except when father's parents were present. Mother also admitted that father's parents often made baked goods with marijuana and brought them to her home, but she denied they were left where the children could get them. She admitted that father made brownies with marijuana in July 2011.

Mother testified that she and father began growing marijuana in January 2011 and had been buying it at a dispensary since they removed the plants after the children were detained. Before that, they got their marijuana from father's parents, who grew it in two rooms in their house. When the children visited father's parents, they were shown the marijuana growing in the rooms and had access to the rooms.

The court found all the allegations in the petitions true. The children were found to be persons described by section 300.

11.

For the disposition hearing, Neuman prepared a report dated October 18, 2011. It stated that the children had been separated. The two older children, E.D. and Junior, were together in one foster placement, and the two younger children, D.D. and N.D., were together in another. The children were reported to be strongly bonded to one another.

Neuman prepared an initial case plan for each parent. The plans required both parents to receive counseling at Haven Counseling. For father, the counseling was for failure to protect. For mother, it was for physical abuse as a perpetrator. Both parents also were to enroll in substance abuse counseling with the goal of demonstrating that they could refrain from the use of illegal substances. Further, the parents were to enroll in a parent training course designed to improve their parenting skills and reduce the likelihood of future abuse or neglect.

A social worker presented the initial case plans to the parents on September 30, 2011. Both refused to sign the plans on the ground that the allegations in the petition were not true. In Neuman's opinion, the parents had made "no progress in alleviating the circumstances which led to the children's removal." She believed that out-of-home placement continued to be necessary.

Neuman prepared a supplemental disposition report dated January 24, 2012. The report stated that a social services supervisor reviewed the initial case plan with father on October 3, 2011. Father said he would not participate in the case plan because he and mother were "innocent." A social worker subsequently reviewed the initial case plan with the parents each month. The parents continued to insist that the allegations in the petition were false. The social worker reported that they "feel that participating in the initial case plan will only contribute against them with regards to their innocence." At the time of the supplemental report, both parents were still denying the allegations and refusing to participate in any counseling or submit to drug testing.

Father "refused to sign an authorization for [E.D.] to take the psychotropic drugs she needs for her anxiety unless the other children were released to him." This refusal necessitated separate dispositional proceedings for E.D. in the juvenile court to enable her to receive her medication without father's consent. E.D. and Junior continued to refuse to visit with the parents. E.D. and Junior had been moved to separate placements.

The disposition hearing for the other three children took place on March 2, 2012. Counsel for mother explained that the parents were seeking the return of N.D. and D.D. only. According to counsel, this was because the parents did not want to make E.D. and Junior come home against their will, "not because the parents wish to express any aversion towards those children."

Mother called Theresa Thompson-Green to testify. Thompson-Green was a social worker employed by the foster care agency and assigned to N.D. and D.D.'s case. Her job was to observe the children in the foster home and monitor their visits with the parents.

Thompson-Green testified that N.D. was having difficulty in the foster home. He was disinclined to do as he was told and had trouble completing his homework. Thompson-Green also observed N.D. at school and found he had similar difficulties there. She found it was hard to make him sit still, listen to the teacher, and complete his work.

Thompson-Green observed six to eight visits with the parents. The visits went well. At the beginning of each, N.D. ran to his parents, jumped into their arms, and said he loved them. The two boys would play basketball or soccer with the parents and then they would have a meal together. The children were responsive to the parents' guidance. The parents and children behaved appropriately toward each other. Father helped N.D. with his homework, and N.D. sat still, listened, and appeared to make progress. At the ends of the visits, the children hugged the parents and said they loved them. Thompson-Green saw no problems in the relationship between the parents and the children. The

parents never appeared intoxicated. The children said they wanted to return to their parents. Thompson-Green never observed anything that would cause her to believe the children would be at risk in the parents' care.

On cross-examination, Thompson-Green testified that she was not familiar with the circumstances that had led to the children's removal. She said it would surprise her to learn that mother had struck one of the other children, poured water on her and knocked her out of a chair, or that father fed the children marijuana and used them to cultivate and transport marijuana. She did not know whether these facts would change her opinion about whether the children would be at risk in the parents' care, but she conceded, after hearing them, that the parents' good behavior during the visits could "be deceiving." She agreed that N.D.'s poor behavior with the foster parents might be an example of testing adults to see how far he could go.

Mother called Angelique Flores to testify. Flores was a county social worker. She was assigned to N.D. and D.D.'s case and her job was to monitor parental visits and monitor the initial case plan. She testified that the parents were participating in a portion of the initial case plan. They had enrolled in late January at Haven Counseling in a program called Family Matters on parenting and child neglect. They attended twice a week. They did not enroll in any counseling before that because they believed they were innocent and because their attorneys had advised against it. For the same reasons, they were continuing to refuse to submit to drug testing and had not agreed to be assessed for substance abuse counseling. They were continuing to use marijuana and had told Flores they did so for medical reasons. They told Flores that if the court ordered them to participate in substance abuse counseling and to submit to drug testing, they would comply.

Flores supervised visits every other week for six months. The parents attended every scheduled visit. She considered the visits to be successful. The children were

always very happy to see the parents. They were respectful and obedient. The parents never appeared intoxicated and never smelled of marijuana.

Flores went to the family's house monthly for announced visits. She found the house to be very clean and well-maintained and saw no safety hazards. She saw no marijuana.

Flores gave equivocal testimony when asked her opinion about whether there would be a substantial risk to the children if they were returned home. Mother's counsel asked whether Flores had "seen anything" in the course of her observations that indicated a risk to the children. Flores said no. Counsel for N.D. asked Flores whether she had any objection to the children being returned to the parents. Flores said, "Based on my experience with the parents—and I'm talking about my experience only—I don't object." During cross-examination by counsel for the county, however, Flores gave a different opinion. Counsel asked whether Flores was aware of the court's findings that the children were exposed to marijuana smoke, used for cultivating and transporting marijuana, and fed marijuana. Flores said yes. Counsel then asked whether, in Flores's professional opinion, it would be appropriate to return the children to the parents. Flores said, "Based on what you are telling me, no." Father's counsel then sought clarification, asking Flores, "So would you say your experience with the parents isn't consistent with what was found true [by the court]?" Flores said yes.

Counsel for the county did a re-cross and asked whether Flores's testimony was that, based on her own observations, she did not see a risk to the children in returning them home. Flores said yes. Then counsel asked, "You have a different opinion, however, … based upon all of the sustained facts of the allegations and the petition. Is that correct?" Flores said, "That's correct." Mother's counsel continued to pursue the matter on re-direct. He asked, "Based on everything that you know about this case at this time, do you believe that [D.D.] and [N.D.] would be at—that there's a substantial risk of abuse or neglect if the children were returned at this time?" Flores said no.

15.

Counsel for the county did another re-cross and asked whether, in light of "all of the facts of the petition that have been sustained, including the fact that the children have been exposed to secondhand smoke, they have been asked to cultivate and transport, notwithstanding and including the physical abuse to [E.D.], you think it's safe for these children to go home based on your knowledge, skills and experience as a social worker of the department?" Flores answered no. She tried to clarify her apparently conflicting testimony by saying that "what I know now from my experience" with the family was "cloud[ed]" by her knowledge of the court's prior findings. Counsel also asked, "Do you have any reason to suspect that [the parents] would stop the prior behaviors that the court has found places these children at risk without some counseling?" Flores said no.

D.D. testified. He had seen marijuana growing in his back yard and had seen mother smoking it. He said he had never been mistreated by either parent, had never seen the parents mistreat N.D., and was not afraid of the parents. He had seen changes in both parents. Father was not as angry as he used to be, and D.D. felt father loved him more. Father told him he was sorry about the situation and would do everything he could to bring D.D. home. Mother's attitude was not good before, but it was much better now. D.D. wanted to go home, and he wanted N.D. to go home.

Counsel for E.D. and N.D. made offers of proof for them, which were accepted by all parties. E.D. would have testified that she had been in contact with N.D. and D.D. through sibling visitations and that she believed it would be in both boys' best interest to go home. N.D. would have testified that he wanted to go home.

Father testified. He said he found the Family Matters course at Haven Counseling to be helpful. The class helped him "try to learn empathy with [his] children." He looked forward to going to class. Commenting on D.D.'s remark that father was less angry, father said, "I feel I'm the same person. But I do understand exactly what [D.D.'s] talking about, because, yes, I have toned it down a lot." Father had stopped growing

16.

marijuana at his house, saying "[i]t's a danger to my children." He said he would never do it again.

Father continued to smoke marijuana, however. He smoked twice a day, consuming about $5 worth of marijuana or three joints each week. He said, "I do it for medical reasons only. I am not a stoner. I smoke medical marijuana." He said he intended to continue smoking it.

Father's attorney examined him on the question of whether he would obey the court's orders if the children were returned to him. He said he would, but his testimony reflected ambivalence, and he declared that he would not enroll in substance abuse counseling as he was convinced he had no marijuana abuse problem. He also appeared not to understand why he would need counseling on the issue of failure to protect his children:

> "Q. Okay. Are you willing to comply with any orders of the court in order—if your children are returned to you, will you comply with any orders of the court?
>
> "A. Yes, I would.
>
> "Q. Would that include abstaining from the use of marijuana?
>
> "A. It's my medical—it's medical. I'm not abusing it. It's a medical—
>
> "[County counsel]: Objection. Move to strike.
>
> "[N.D.'s counsel]: Objection.
>
> "THE COURT: Sustained.
>
> "BY [father's counsel]:
>
> "Q. M[y] question is if the court returned your children and told you not to use marijuana, would you comply with that?
>
> "A. Yes.
>
> "Q. Okay.

"And if the court returned your children and told you to take substance abuse, would you comply with that?

"A. No. Because I don't do drugs.

"Q. Okay.

"A. I smoke medical marijuana.

"Q. Okay.

"A. I have a doctor's recommendation for it. I would never tell nobody to stop taking their pills—their cholesterol pills. I would never tell anybody to stop taking pain pills.

"[County counsel]: Objection, your Honor. Narrative. Move to strike.

"THE COURT: It's stricken.

"BY [father's counsel]:

"Q. If the court returned your children, you would stop smoking marijuana and you would test?

"A. Yes, I would.

"Q. Okay. And are you willing to take the failure-to-protect class when you complete the Family Matters class?

"A. Failure to protect?

"Q. Yes.

"A. Who?

"[County counsel]: I'm sorry, I didn't hear that.

"THE WITNESS: Who did I fail to protect?

"BY [father's counsel]: [¶] Q. You understand that the department's asking you to take a failure-to-protect class?

"A. No, I didn't.

"Q. Family—

18.

"A.  Okay.  Yes.

"Q.  If the court returned your children, would you be willing to take that class?

"A.  Yes."

Mother testified.  She said the house still had marijuana in it, but no marijuana plants were growing there.  She said she would do whatever was necessary to comply with any orders made by the court in returning the children, including abstaining from marijuana, keeping it out of the house, and finding a medical alternative to it.  She said she was willing to comply with any orders to attend classes and counseling, but she was in danger of losing her job as a dental assistant because her employer was becoming impatient with her frequent need to leave for counseling or classes.  There was a delay in her beginning the Family Matters class because of a conflict with her work schedule.

Father's counsel argued that N.D. and D.D. should be returned home and family maintenance should be ordered.  She said the failure-to-protect finding was based only on the altercation between E.D. and mother, and there was never any risk of abuse to N.D. and D.D.  The only risk to them, counsel contended, arose from the parents' marijuana use.  Both parents testified that they would stop using marijuana if ordered.  Father said he would not participate in substance abuse counseling, but substance abuse counseling was unnecessary and should not be ordered because father was not abusing marijuana.  The only risk to the children arose from their exposure to the smoke and from their utilization by the parents in cultivating the plants.  Because the parents had pledged to stop using and had already stopped cultivating, these risks had been eliminated.

Counsel for mother argued that Thompson-Green and Flores did not see any indications of risk during the visits or in the house.  He said the parents' marijuana use was medicinal and that, unlike "what we usually see in drug cases," the parents were employed and their house was clean.  He argued that the court could not find by clear and convincing evidence that there would be a substantial risk to the children if they were

19.

returned home, and that there were no reasonable means by which they could be protected without being kept from the parents' custody. Counsel for D.D. argued that D.D. should be returned with family maintenance services. Counsel for N.D. submitted without argument.

Counsel for the county cited *In re Alexis E.* (2009) 171 Cal.App.4th 438 for the proposition that the juvenile court had discretion to order a parent with a medical marijuana card to stop using marijuana. She asked the court to follow the department's recommendation to continue the children's removal and order family reunification services. She argued that the court's orders should include an order to abstain from marijuana and to submit to drug testing and substance abuse counseling. She said, "I think there's every indication that the risk that the court found at the jurisdictional hearing from the parents' use of marijuana has continued unabated since we've dragged this disposition out these several months. [¶] … [¶] [W]e have the reports. We have all of the information that's already in evidence. The lengthy use of marijuana. Criminal involvement with marijuana that goes back 25 years for the father and probably ten years by mom, if that's fair to say, based on her testimony at jurisdiction."

The court accepted the department's recommendation. It stated:

"At this time, the information in the report the court had received was that, among other things, the father stated he was not going to participate in the case plan because he was maintaining his innocence. And as I indicated to counsel, what I was interested in was whether or not the father, in particular, the parents as [a] whole, were going to participate and comply with the orders of the court as administered through the Department of Human Services.

"According to the report, the father's marijuana use goes back 25 years. He's—according to the petition, he's 38 years old. So it goes back quite a ways. So it predates significantly the so-called medical marijuana law. And the findings of the court are that he daily exposed the children to smoke. And we heard from the mother's—the way she used it was in her room, but that obviously it was being smoked.

20.

"So the court at this time finds that the purposes of this whole process to reunite the family can be achieved by the cooperation of the parents with the orders of this court, which are designed to reunify the family entirely. But, at this juncture, the court's going to order reunification [i.e., continued removal of the children with family reunification services]. And the court wants to get this matter to where the children are at home as soon as possible. But they are going to have to show that they are willing to comply with the orders of the court for the benefit of the children. That based on the evidence presented here today, the court is going to follow the recommendations that are—have been submitted."

After making these remarks, the court noted for the record that "[t]he father just stormed out of here, counsel. That's exactly what we're talking about."

The court found that father and mother had made no progress toward alleviating the causes of the children's removal. It found clear and convincing evidence that there would be a substantial danger to the physical or emotional well-being of the children if they were returned to the parents' custody and that there were no reasonable means of protecting them from that danger without continued removal from their custody. It ordered father and mother to participate in counseling for substance abuse and parenting and to submit to random, unannounced urine testing for drugs. It ordered father to participate in counseling for failing to protect his children and it ordered mother to participate in counseling for physical child abuse as a perpetrator. The court ordered a review hearing in four months.

## DISCUSSION

### I. *Sufficiency of evidence supporting jurisdictional findings*

The father first argues that the evidence before the court at the jurisdictional hearing was not sufficient to support the finding that the children were persons described by section 300. The petitions alleged that N.D., the youngest child, was a person described by section 300, subdivisions (a) and (b), and that the other children were persons described by section 300, subdivision (b). Subdivision (a) states that a child is within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a

21.

substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian.  For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm.  For purposes of this subdivision, 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks where there is no evidence of serious physical injury."  Subdivision (b) states that a child is within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

"When an appellant asserts there is insufficient evidence to support the judgment, our review is circumscribed.  [Citation.]  We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof."  (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.)

The evidence before the court at the jurisdictional hearing included the agency's report prepared for that hearing, the agency's report prepared for the detention hearing, and the mother's testimony.  From this evidence, the court could reasonably infer that,

even if the parents had legitimate reasons to use marijuana responsibly, in reality they used it abusively, used it in the car with the children present, routinely exposed the children to marijuana smoke, fed marijuana to the children, and used the children to cultivate marijuana. It also could reasonably infer that the parents had a long history of physically abusing the children and that the abuse continued up to the time when the children were detained. This evidence was more than enough to support the juvenile court's jurisdictional findings.

Father argues that the evidence was insufficient because his marijuana use was not combined with indications that it was likely to lead to serious physical harm to the children. He says, "In light of Father's allegedly longstanding daily use, if he used marijuana on thousands of past occasions without any tangible harm to the children, there is absolutely no basis for inferring such risk in the future."

The record is not consistent with father's description of his marijuana use as harmless. There was evidence that both parents had physically abused the children over many years. The record did not specifically tie this physical abuse to marijuana intoxication, but the court could reasonably infer a connection, since there was evidence that the marijuana use was chronic, daily, and continual. The case is similar in this respect to *In re Alexis E., supra,* 171 Cal.App.4th at pages 452-453, in which the children said the marijuana-abusing father was dangerous, frightening, and physically abusive to them and to his girlfriend. The Court of Appeal held that the evidence was sufficient to support jurisdictional findings under section 300, subdivision (b). (*Alexis E., supra,* at pp. 440 & fn. 2, 453.)

The court also could reasonably find that father endangered the children by smoking marijuana in the car. Father states that "[i]f it really was true that Father smoked marijuana every day on his way to work, then he apparently drove safer under the influence of marijuana than most drivers do without it." This contention is absurd. The record does not show that the father drove safely. It shows that he smoked marijuana

23.

in the car when the children were with him. Assuming he did this while driving—that is, assuming he did not load the children in the car for no reason and then begin smoking—his behavior was inherently unsafe for the children.

Father makes additional arguments that the children's daily exposure to marijuana smoke, the feeding of marijuana to the children, and the use of the children in marijuana cultivation all could not establish a risk of serious physical harm. He also argues that, although the petition for N.D. differed from the others in that it alleged physical danger to him under section 300, subdivision (a), related to mother's physical abuse of E.D., there was no specific evidence that mother might harm N.D. just because she was harming E.D. We are not persuaded by these additional arguments (see, e.g., *In re Alexis E., supra,* 171 Cal.App.4th at p. 452 [mere use of marijuana by parent alone not enough to support jurisdictional finding, but risk not speculative where father exposed children to secondhand marijuana smoke]), but we need not address them further. The evidence we have already discussed was sufficient to support the jurisdictional findings as to all the children under section 300, subdivision (b). "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence." (*In re Alexis E., supra*, at p. 451.)

The agency argues that we should not address father's argument about the sufficiency of the evidence in support of the jurisdictional findings because father did not make an objection based on sufficiency of evidence in the trial court. It is unnecessary to address this contention since we conclude that the evidence was in fact sufficient. We remind the agency, however, of the well-established principle that the sufficiency of the evidence to support a judgment or order is not among the issues that need to be raised in the trial court in order to be preserved for appeal. (*People v. Butler* (2003) 31 Cal.4th

24.

1119, 1126; *Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17; *In re Brian P.* (2002) 99 Cal.App.4th 616, 623.)

## II.  *Court's remarks at disposition hearing regarding relitigation of facts established at jurisdiction hearing*

At the disposition hearing, the court excluded certain testimony on the ground that it related to facts that already had been established at the jurisdiction hearing.  While examining D.D., mother's counsel asked for a description of the arrangement of the back yard garden where the marijuana was growing as it existed before the children were detained.  The court interrupted:

> "THE COURT:  Counsel, the court's already made findings.  I am not going to entertain relitigating those issues.  We're here for a disposition. [¶] … [¶]
>
> "[MOTHER'S COUNSEL]:  Your Honor, we're going to the issue of standard of clear and convincing evidence that these children would be at risk, and I'm just asking so that we have clarification what the element of risk would have been.
>
> "THE COURT:  If you want to ask questions about what's going on at the home now if he's aware of that, you can ask him."

Shortly afterward, mother's counsel asked D.D. about the places and times he saw mother using marijuana before the children were detained.  Counsel for the agency objected, saying the risk to the children shown by the parents' behavior before the children were detained had already been litigated.  The court agreed:

> "At this point, counsel, the issue again is disposition.  So if you have something that you want to present regarding disposition, you may.  But I am not going to get into areas that have already been adjudicated by this court where there's findings that have been made.  We're not gonna reopen any areas that have already been adjudicated."

Later, father's counsel began questioning him about the amount and frequency of his marijuana use and his reasons for using it.  Counsel for the agency objected.  The court then had this exchange with father's counsel:

25.

"THE COURT: Well, counsel, there's been no dispute that he uses marijuana regularly. That's already been found to be true.

"[FATHER'S COUNSEL]: Well, what is regularly?

"THE COURT: Well, counsel, I am not—

"[FATHER'S COUNSEL]: That's why—I mean, I'm just trying to get all the information before the court—

"THE COURT: Well, counsel, we've already had the information presented to us.

"[FATHER'S COUNSEL]: Well, actually, you haven't had that presented to you.

"THE COURT: Well, counsel, the court's made findings. Jurisdiction—the court has found jurisdiction in this case. The matter is disposition. So—

"[FATHER'S COUNSEL]: And—

"THE COURT: If you want to ask him questions about his willingness to comply if the court orders him to do certain things, you may do that. But I don't need to get into why he's here. We know why he's here. There's allegations made. The court's made findings. And now the question is how's the best way to handle this so that the family can be reunified and the case can be terminated at some point.

"[FATHER'S COUNSEL]: Well, that's where I'm trying to go, your Honor.

"THE COURT: All right.

"[FATHER'S COUNSEL]: So you are not interested in why he has a medical marijuana card, then? Is that what you are saying?

"THE COURT: At this time counsel, if you have a question you want to ask him. I'm not the one that's here being questioned. He is. He's the witness."

Father's counsel then asked father why he had a medical marijuana card. The agency's relevance objection was sustained.

26.

Father now argues that the court erred in excluding additional evidence about his use and cultivation of marijuana, mother's use of marijuana, and the condition of the garden. He argues that the jurisdictional findings on those issues should have "informed but not controlled disposition." He points out that, although the standard of proof at the jurisdictional stage is a preponderance of the evidence, at the dispositional stage it is clear and convincing evidence.

Because of the different standards of proof, father is correct when he says that, in theory, findings about marijuana use that are sufficient to establish a risk of harm for purposes of jurisdiction could be insufficient for purposes of continuing the children's removal at disposition. That is, evidence about marijuana use that showed, by a preponderance of the evidence, enough risk to establish that the children were persons described by section 300, still might not show enough risk to establish by clear and convincing evidence that the children could not be returned home safely. Yet father and mother proffered nothing at trial and describe nothing in this appeal that would have made a difference under the circumstances of this case. The court could reasonably have found that there was clear and convincing evidence of substantial risk based on the marijuana facts as presented at the jurisdictional hearing alone. The court was aware of the father's claims that he used marijuana moderately and only for medical purposes. There is no likelihood that if the court had allowed him to reiterate these claims[4] at the disposition hearing, or allowed D.D.to state additional details about the arrangement of the garden or the parental behavior he observed, it would have reached a different

---

[4]Father's brief suggests that he was trying to tell the court his usage had declined. "Although the petitions asserted (and the court found) Father exposed each child to smoke on a daily basis as of the summer of 2011, his disposition testimony was that he was smoking less than half as often in March 2012." The record citations father supplies at this point, however, do not bear out the claim. The testimony to which the agency's counsel objected was that father was still smoking twice a day.

27.

ultimate conclusion because of the different standard of proof. Any error in the reasons the court stated for disallowing the testimony, therefore, was harmless.

### III. *Sufficiency of evidence to support removal at disposition hearing*

Father argues that the evidence presented at the dispositional stage was not sufficient to support the court's decision to continue the children's removal from the home. To support this decision, the court was required to make two findings: (1) that there would be "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home"; and (2) that there are "no reasonable means by which the minor's physical health can be protected without" removal. (§ 361, subd. (c)(1).) These findings must be supported by clear and convincing evidence. (§ 361, subd. (c).) The prior findings at the jurisdictional stage are "prima facie evidence that the minor cannot be safely left in the physical custody of the parent or guardian with whom the minor resided at the time of injury." (§ 361, subd. (c)(1).)

We conclude that there was substantial evidence to support the ruling. The evidence included the disposition report prepared for the department by Neuman and updated by her five weeks before the hearing. Her report and supplemental report recommended continued removal based on the parents' long history of inappropriate marijuana use and exposure of the children to marijuana, combined with Neuman's opinion that the parents had made no progress. Neuman was present at the disposition hearing; she was not called as a witness by either side, so the court could reasonably infer that her views had not changed.

Besides the evidence related to marijuana use, exposure, cultivation and transportation, Neuman's reports contained evidence of a long history of physical and emotional abuse and neglect in the family. There was evidence that when E.D. was 10 years old, her parents withdrew her from school so she could supervise the other children and literally beat her black and blue as well. The inaction of the authorities in Nevada

28.

does not mean the abuse did not take place. Bruises were seen on E.D. by disinterested third parties, and father admitted to hitting her with a belt. By advising father to stop leaving marks and warning him of criminal consequences, the authorities implicitly found that he had inflicted the bruises through excessive discipline. In Kern County, past referrals involving the three older children for physical abuse, emotional abuse, general neglect, and failure to protect were found to be substantiated.

Father emphasizes his and mother's testimony that they would follow the court's orders if the children were returned to them. There was other evidence, however, on the basis of which the court could reasonably find that the parents had little understanding of the reasons why the children were removed and that, therefore, the risks continued. Father said he had learned the importance of feeling empathy for his children, but two months earlier the department had needed to pursue separate dispositional proceedings for E.D. because father refused to give his consent to allow her to receive her anxiety medication. He said E.D. could not have the medication until he got the other children back. This might have been intended as a cruel punishment for E.D.'s courageous decision to contact the authorities in this case, or it might have been a misguided attempt to bargain with the department, but in any event, it destroyed any credibility father had in claiming he had learned empathy. It also supported Neuman's opinion that father had made no progress.

Father's initial response when asked whether he would participate in counseling for failure to protect was similarly revealing. "Who did I fail to protect?" he asked. Father asked this question during a court proceeding that was the culmination of years of abuse and neglect: three substantiated referrals in Bakersfield, two warnings in Las Vegas, and lifetime daily exposure to secondhand marijuana smoke for all the children. Father backpedaled after this and said he would participate in the counseling, but his true state of mind had already been revealed. Father's angry departure from the courtroom could reasonably be interpreted as a further expression of his sense that he was being

29.

persecuted for no reason. Neuman's opinion that father had made no progress was still well-supported at the time of the hearing.

Although father ultimately said he would abstain from marijuana and submit to testing, the whole of his testimony at the disposition hearing provided an ample basis for the court to agree with Neuman's opinion that father had not made progress on the issue of marijuana use. Although he had been using marijuana since early adolescence and had for years exhibited exceptionally poor judgment in exposing his children to marijuana smoke, feeding his children marijuana, using his children to cultivate and transport marijuana, and smoking marijuana while driving, he refused to consider the possibility that he had a substance abuse problem because he now had a medical recommendation. He declared he would not submit to an order to participate in substance abuse counseling because he did not "do drugs." Even legal drugs can be abused, and there was substantial evidence that father is a lifetime abuser of marijuana, even if he currently has a medical condition that can be helped by marijuana. The court could reasonably find that father's testimony demonstrated an ongoing risk arising from his refusal to acknowledge even the possibility that he has a problem.

Neuman's opinion that mother had not made progress on the issue of physical abuse also continued to be supported at the time of the disposition hearing. At the jurisdiction hearing, mother blamed E.D. for the altercation that led to the children's removal. At the disposition hearing, mother said she would participate in any counseling that was ordered, but, unlike father, she did not testify that she had gained insight. Her counsel had argued on her behalf at the jurisdiction hearing that the physical-abuse issue was insignificant and should be stricken from the petition. There was no indication at the disposition hearing that mother's view of the matter had changed.

For all the above reasons, we conclude that the juvenile court reasonably could find, by clear and convincing evidence, that there would be substantial danger to the

children's physical health, safety, protection, or physical or emotional well-being if they were returned home.

The finding that there were no reasonable alternatives to removal also was supported by substantial evidence. The court's decision not to return the children was founded, in essence, on a determination that the parents were not credible when they professed that they had addressed the issues that had necessitated the children's detention. The facts that supported this determination also supported the court's finding that there were no reasonable alternatives to continued removal, for the parents essentially believed they had done no wrong. They could not be relied upon to comply with a program of in-home measures designed to protect the children.

## IV.  *Agency's request for dismissal of appeal*

The Kern County Department of Human Services filed a letter on October 5, 2012, asking us to dismiss father's appeal as to E.D. only. The reason for the dismissal would be that the juvenile court terminated its jurisdiction over E.D. in an order dated August 21, 2012, two weeks after E.D. turned 18. The agency argues that the appeal should be dismissed because the juvenile court's termination of jurisdiction renders the appeal moot and means no effective relief could be granted if we were to reverse.

We ordered father to respond to the request in his reply brief. He argues that the appeal should not be dismissed because, if we were to reverse, the effect on father's record would be beneficial to him. He also argues that there are some issues in E.D.'s case that are of public significance, justifying a decision on the merits in spite of mootness. Finally, he argues that if we dismiss the appeal as to E.D., we should exclude from our consideration of the remainder of the appeal some or all of the evidence provided by or regarding E.D.

31.

We exercise our discretion not to dismiss the appeal as to E.D. Father, as appellant, does not seek its dismissal, and the agency, though requesting dismissal, will not be prejudiced, since we are affirming on the merits. Further, there is no efficiency to be gained by dismissal, since the appeal must be decided for the rest of the children, and there is in essence a single, unified record (although there were several case numbers in the juvenile court and separate petitions for each child). This disposition of the matter renders it unnecessary to consider whether dismissal would mean that any of the evidence should be excluded from our consideration.

## *DISPOSITION*

The jurisdictional and dispositional orders of the juvenile court are affirmed. Respondent's request for dismissal of the appeal as to E.D. is denied.